***********
The undersigned have reviewed the prior Amended Opinion and Award based upon the record of the proceedings before Deputy Commissioner Glenn and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties. The Full Commission affirms the Opinion and Award of Deputy Commissioner Glenn and enters the following Interlocutory Opinion and Award:
 *********** EVIDENTIARY MATTERS
Plaintiff filed a Motion for Assessment of Attorney's Fees on Appeal on July 19, 2010. The Full Commission, in its discretion, holds plaintiff's motion in abeyance until a final Opinion and Award is entered by the Full Commission. *Page 2 
Plaintiff also filed a Motion to Supplement Record on July 28, 2010. The Full Commission, in its discretion, deems the issue raised in plaintiff's motion moot by entry of this Interlocutory Opinion and Award, therefore the motion is hereby DENIED.
 ***********
The Full Commission finds as a fact and concludes as a matter of law the following, which were entered into by the parties as:
 STIPULATIONS
1. At the time of the alleged injury which is the subject of this claim, February 24, 2005, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act, the defendant employed three or more employees, and the employer-employee relationship existed between the defendant and plaintiff.
2. The defendant was a duly qualified self-insured employer under the North Carolina Workers' Compensation Act at all times material to this claim.
3. Plaintiff's average weekly wage is sufficient to generate the maximum compensation rate on the date of plaintiff's alleged injury.
4. Plaintiff has not worked since February 25, 2005.
5. Plaintiff contends the issues for decision by the Commission include the following: (a) whether plaintiff was injured by accident arising out of and in the course of his employment with the defendant on February 24, 2005; and (b) if so, the medical compensation and compensation for temporary and permanent disability to which plaintiff is entitled as a result of this injury. Defendant contends the issues for decision by the Commission include the following: (a) whether plaintiff sustained an injury by accident arising out of and in the course of his employment with the employer; (b) whether plaintiff's alleged injury and disability proximately resulted from an *Page 3 
idiopathic condition; (c) whether plaintiff has been disabled as the proximate result of a compensable incident of his employment; and (d) what benefits, if any, plaintiff is entitled to recover.
6. Plaintiff's average weekly wage based on Industrial Commission Form 22 prepared by the defendant.
7. The stipulations contained in the parties' January 26, 2006 Pre-Hearing Agreement, June 5, 2006 Supplemental Stipulation on Average Weekly Wage, April 6, 2009 Supplemental Stipulations, May 20, 2009 Supplemental Stipulations, and September 23, 2009 Stipulation for Consolidation of Exhibits, are incorporated fully into this record.
8. At the hearing before the Deputy Commissioner, on the record, the parties entered into the following stipulation with respect to Mr. Rawls' residual permanent scarring as a result of his injuries on February 24, 2005. The parties stipulated: Mr. Rawls has a scar on the right forehead. It is an indentation, approximately one inch in length, and visible for at least ten feet. It is not a keloid scar. There is no keloid formation. The scar is arc-shaped. The depression is approximately one-half inch wide on the outer side, where it begins, to the other side of the scar. There also is a scar on the left lower leg below the knee. It runs vertically to the kneecap. This scar is approximately three inches in length and the lower one and one-half inch of the scar is raised approximately one-quarter inch. And at that spot, it is approximately one-quarter inch in width. The scar is visible from at least ten feet.
9. The following exhibits were admitted into evidence at the hearing:
 a) Stipulation #1, 375 pages plus an additional 53 pages.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT *Page 4 
1. Plaintiff was sixty-six (66) years old at the time of the hearing before the Deputy Commissioner. Plaintiff is a high school graduate, and he was employed as a truck driver by defendant for thirty-six (36) years before he was injured on February 24, 2005. Plaintiff was assigned to defendant's Charlotte trucking terminal. Defendant is an interstate motor carrier of freight. About 200 trucks and tractors daily are in and out of this Charlotte terminal. The defendant considered plaintiff a very good employee with a good attendance record.
2. Plaintiff lives in Charlotte with his wife, Sandra, to whom he has been married more than twenty-five (25) years. Sandra Rawls has been employed by Duke Energy for more than twenty-five (25) years. She is employed in the corporate human resources department and has worked with active and former employees, with corporate awards, and with some EEOC compliance. Sandra Rawls has a Bachelor of Science degree in psychology from the University of North Carolina at Charlotte and is currently in Duke Energy training courses in the personnel and human resources areas.
3. Plaintiff was an over-the-road driver. For about four years before February 2005, plaintiff's run consisted of three round trips each week between Charlotte and Tampa, Florida. This typically involved driving the five hundred eighty-five (585) miles to Tampa, taking ten to eleven hours off to sleep and rest and then returning to Charlotte. Plaintiff normally began his first trip from Charlotte on Sunday at about midnight and ended his third trip in Charlotte at noon on the following Saturday.
4. Before his February 24, 2005, injury, plaintiff had intended to retire on April 21, 2005, from his job with defendant. On February 22, 2005, in fact, plaintiff had notified the pension fund in which he participates of his intentions. Plaintiff was not planning to look for work with another employer after his retirement. He intended to drive two more trips following his return from Tampa to Charlotte on Thursday, February 24, 2005. He planned to make one additional round trip that week *Page 5 
and, following a six-week vacation, a final trip which would end on April 21, 2005. Following his February 24, 2005, injury, plaintiff eventually retired effective September 1, 2005.
5. Plaintiff had been generally healthy before February 24, 2005. Plaintiff had been followed by his primary care physician, Dr. Albright, since 1986 and had been examined periodically to qualify as a commercial truck driver. Plaintiff had experienced syncopal or fainting episodes in December 1995 and 1996, and was seen by Dr. Albright. Plaintiff was seen by Dr. Albright on February 17, 2005, with complaints of headaches and some dizziness in early February. Dr. Albright felt that this may have been a side effect of some over-the-counter medicine plaintiff had taken.
6. On Wednesday, February 23, 2005, plaintiff drove defendant's tractor trailer truck to Tampa. Following ten hours off, most of which he spent at a Tampa motel, plaintiff reported to the Tampa terminal. Plaintiff started his run back to Charlotte at about 12:30 a.m. on February 24, 2005. He stopped at a weigh station in Georgia at about 4:30 a.m. and took a ninety-minute nap. He was not feeling good when he woke up. Plaintiff was nauseated and vomited a couple of times and was experiencing a headache. When plaintiff stopped at a rest area in Orangeburg, South Carolina, as was his custom, he was still not feeling well. Sandra Rawls customarily telephoned plaintiff in the morning. When Sandra Rawls called, plaintiff told her that he probably was just coming down with the flu and that he had thought about calling the state patrol to carry him to the hospital. Plaintiff's stomach was still nauseated.
7. Plaintiff approached Charlotte on Interstate 77 and exited the Interstate on a ramp leading to Harris Boulevard to reach defendant's terminal less than one mile away. Plaintiff has no recollection of what occurred on February 24, 2005, when he exited the Interstate. All plaintiff recalls is blood, and using paper towels to wipe blood from his face, and a police officer hitting the window of his truck and asking if he was okay. Blood was observed in the tractor trailer cab. Plaintiff's visible *Page 6 
injuries included a laceration to the right forehead and injury to the right eye caused by an impact with the side window, steering wheel, dashboard, or overhead console in the truck. Plaintiff was placed in an ambulance and transported to Presbyterian Hospital in Charlotte. The billing authorization form for the Mecklenburg EMS Agency indicates that plaintiff was unable to sign this form because "Blood on hands."
8. The tractor trailer plaintiff was driving had left the roadway about half way up the Interstate 77 North off ramp, run over a traffic sign, and finally stopped after getting stuck in the mud. The investigating police officer estimated plaintiff's speed at impact at thirty (30) miles per hour.
9. Plaintiff was seen in the emergency room and admitted to the neurologic intensive care unit at Presbyterian Hospital. Plaintiff was discharged from this hospital on March 1, 2005. The admitting physician noted that plaintiff had a syncopal episode. There was no loss of bladder or bowel function, however, and no seizure activity. Plaintiff had a bruised right shoulder and right eye and a laceration to the forehead. A CT scan showed a left temporal lobe contusion and acute right temporal subarachnoid hemorrhage. Plaintiff's temperature on admission was elevated at 101.7 degrees. Plaintiff had a bloody three-inch laceration on the left lower leg below the knee which was stapled closed.
10. Plaintiff was seen by several specialists and studies were completed during this hospitalization. Dr. William Maggio, a neurosurgeon, felt that no neurosurgical intervention was required after ordering an MRI of the brain. The MRI showed resolving contusions in the left temporal lobe and the right parietal lobe. Dr. Roy Majors, an orthopedic surgeon, examined plaintiff's right shoulder. There was quite a bit of pain and swelling. Dr. Majors diagnosed degenerative disease in the AC joint with acute contusion. Physical therapy was recommended. *Page 7 
11. Following discharge from the hospital, plaintiff was followed initially by his primary physician, Dr. Harold Albright. Dr. Albright is a specialist in internal medicine. Plaintiff also was seen on several occasions by Dr. William Maggio in follow up principally for his cerebral contusion. Plaintiff was seen by Dr. Raminder Saluja, an ophthalmologist, for treatment of his traumatic subconjunctival hemorrhage of the right eye.
12. When he was seen on March 7, 2009, by Dr. Albright, plaintiff stood up slowly, walked with a cane, and was taking a little long to gather his thoughts and concentrate. Dr. Albright continued the therapy in which plaintiff was participating in the hospital. This was done initially at plaintiff's home and later at Presbyterian Rehabilitation Center. The continuation of the physical and occupational therapy ordered by Dr. Albright and Dr. John Majors and later by Dr. Erik Borresen for the right shoulder, for gait imbalance, and for memory deficits, was necessary to treat the effects of plaintiff's February 24, 2005, injury. Plaintiff continued physical therapy at Presbyterian Rehabilitation Center into late June 2005 but stopped when he exhausted his group medical insurance benefit available for this treatment. One test for information processing for immediate memory completed in May 2005 at Presbyterian Rehabilitation Center showed improvement from the fifth to the sixty-third percentile.
13. Plaintiff was first seen by Dr. Erik Borresen on April 14, 2005, following referral from Dr. Albright. Plaintiff has continued under Dr. Borresen's care for treatment of his February 24, 2005, neurological injuries. Dr. Borresen is a board-certified neurologist who has practiced neurology since 1983. He has practiced since 1996 with Mecklenburg Neurological Associates in Charlotte. Dr. Borresen is a former medical director of the stroke program at Presbyterian Outpatient Rehabilitation Center. *Page 8 
14. On April 14, 2005, plaintiff complained to Dr. Borresen of severe headaches, right shoulder pain, poor memory and concentration, and unsteadiness on his feet. Dr. Borresen's neurological examination was fairly unremarkable. Dr. Borresen felt plaintiff could not return to work but should be able to drive a standard car. When plaintiff was seen on June 2, 2005, Dr. Borresen noted that plaintiff had been enrolled in speech therapy and physical therapy, and his memory and walking had improved. Plaintiff's physical examination was unremarkable. Dr. Borresen reviewed the previous medical records he now had and concluded that plaintiff had sustained a "cerebral contusion and traumatic subarachnoid hemorrhage." Dr. Borresen ordered a repeat MRI and EEG.
15. On July 5, 2005, Dr. Borresen considered plaintiff's general and neurologic examination unremarkable. Dr. Borresen's impression was that plaintiff's gait had "returned to normal," and that plaintiff then had a "complete recovery" from his February 24, 2005, head injuries. Dr. Borresen released plaintiff from his care to return as needed and told plaintiff he could drive a standard car but could not return to commercial truck driving because of the stroke and subsequent brain injury which had occurred on February 24, 2005. Based on his examination and review of the medical records and studies on July 5, 2005, Dr. Borresen's opinion was that on February 24, 2005, plaintiff had a right cerebral infarct or stroke "that caused him to drive off the road and have an accident and then hit his head and then have a contusion" to the brain. It is possible that the head injury had caused the stroke but, Dr. Borresen felt that it was more likely than not that the head injury and left temporal traumatic contusion followed the stroke.
16. Dr. Albright examined plaintiff on four occasions following March 7, 2005, through July 26, 2005. On March 14, 2005, Dr. Albright's mental status examination was abnormal and corroborated plaintiff's complaints of problems with his concentration and memory. Dr. Albright opined that plaintiff was unable to do any type of work at that point. On April 5, 2005, plaintiff *Page 9 
complained of experiencing dizziness of up to one minute when going from sitting to standing. The headaches plaintiff had been experiencing since his accident were a little better. Plaintiff's problem with memory and concentration was observed by Dr. Albright to be slightly improved. Plaintiff's gait was wide based, and he was having difficulty with balance. He could walk a short distance with a cane. On June 14, 2005, Dr. Albright noted that plaintiff's balance problem was improving and recommended that plaintiff continue with formal therapy at the Presbyterian Rehabilitation Center. Plaintiff also was complaining of right hand and arm weakness. When seen on July 26, 2005, plaintiff was experiencing less dizziness when getting up from a seated position and was stronger. However, plaintiff was still observed with a somewhat wide gait. Plaintiff was then being treated by an orthopedic surgeon for flexor tenosynovitis in the right wrist. In Dr. Albright's view, plaintiff had not completely recovered from his February 24, 2005, injuries by July 26, 2005.
17. Dr. Albright commented extensively on plaintiff's ability to work following the February 24, 2005, injury. Dr. Albright initially stated the opinion that plaintiff was unable to do any work in the competitive labor market at the time of his examination on July 26, 2005. As of July 26, 2005, Dr. Alright would have restricted plaintiff to sedentary or sitting activity without pushing, pulling, or lifting. Sitting would have been required for at least four hours in a workday, and plaintiff would have had to have the option to sit and stand during the workday. Plaintiff also would have been restricted to work requiring few academic skills. He would have been unable to participate in work requiring concentration or dealing with numbers and particularly complex math.
18. On August 24, 2005, plaintiff experienced a seizure when backing his car from his driveway. Plaintiff does not recall anything after he placed his foot on the gas pedal. Plaintiff's car backed down the driveway and across the street into his neighbor's yard. Sandra Rawls observed this *Page 10 
occur and called an ambulance after finding plaintiff unconscious in his car. Plaintiff's jaw muscles had contracted, and plaintiff was unable to move when the ambulance arrived.
19. Plaintiff was admitted to Presbyterian Hospital where he remained until August 26, 2005. He was examined by Dr. Erik Borresen's associate, Dr. Michael Amira, a neurologist, who felt plaintiff had experienced a seizure. Dr. Amira started plaintiff on Trileptal for controlling seizures. Plaintiff immediately complained of back pain when he arrived at the emergency department on August 24, 2005. Imaging studies demonstrated an acute compression fracture at the T12-L1 level. The compression fracture is a complication of the seizure which occurs when the muscles contract so forcefully that the vertebrae collapse.
20. Plaintiff was seen by Dr. Borresen on August 31, 2005. He was complaining of dizziness and back pain and was using a cane. An EEG during plaintiff's hospitalization was read as abnormal. Dr. Borresen continued plaintiff on Trileptal. Plaintiff has continued on this medication for control of seizures. On September 30, 2005, when plaintiff was examined by Dr. Borresen, he was complaining of low back pain. Dr. Borresen noted that plaintiff was not to drive for at least six months following his August 24, 2005, seizure. On December 19, 2005, plaintiff complained of back pain and dizziness when he was seen by Dr. Borresen. Dr. Borresen noted that the back symptoms were improving. He also noted that plaintiff had a reduced range of motion in the shoulders.
21. Following plaintiff's August 24, 2005, seizure, plaintiff was seen by his primary care physician, Dr. Albright, on September 14, 2005. Plaintiff was more tired than before his seizure. Plaintiff was complaining of back pain, which was slowly improving, and was walking with a cane. On October 26, 2005, plaintiff complained to Dr. Albright of left side or flank pain. Dr. Albright felt this was from a radiculopathy from plaintiff's compression fracture. *Page 11 
22. Plaintiff was rarely walking with a cane when he was seen on the next occasion by Dr. Albright on January 11, 2006. Plaintiff told Dr. Albright that things did not smell or taste as they used to. Dr. Albright explained that this can occur with brain trauma. Dr. Albright encouraged plaintiff to see Dr. Roy Majors again concerning the stiffness he was experiencing in his shoulders. On February 27, 2006, plaintiff reported to Dr. Albright that he was not having headaches and then felt he had good coordination. Plaintiff's gait was then within normal limits. On May 10, 2006, Dr. Albright noted that plaintiff still walked with an abnormal slightly wide-based gait "with closed head trauma." Dr. Albright felt plaintiff was unable to do any work in the competitive labor market during the time plaintiff was seen from September 14, 2005, through May 10, 2006. Plaintiff and Sandra Rawls saw Dr. Albright on September 6, 2006, and discussed the problem plaintiff was then experiencing with memory. Following September 6, 2006, plaintiff continued to see Dr. Albright.
23. Dr. Albright testified concerning the relationship of some of plaintiff's complaints to his February 24, 2005, accident. Dr. Albright expressed the opinion that any peripheral neuropathy condition which plaintiff may suffer is unrelated to the February 24, 2005, injuries. This condition, however, may compound or aggravate the effects of plaintiff's gait and imbalance problems which were initiated by the February 24, 2005, traumatic brain injury. Dr. Albright also testified that both the traumatic injury to the brain tissue and stroke can cause memory loss. Dr. Albright attributed at least some of the dizziness and imbalance problems plaintiff experienced to the injury to plaintiff's brain which occurred on February 24, 2005. Plaintiff's difficulty concentrating following February 24, 2005, was due to plaintiff's stroke or the left temporal lobe injury on February 24, 2005.
24. Dr. Albright also expressed an opinion on whether plaintiff's August 24, 2005, seizure was secondary to his February 24, 2005, traumatic brain injury. Dr. Albright stated initially that "the seizure disorder is secondary to the brain injury." On cross examination, however, Dr. Albright *Page 12 
acknowledged that the seizure disorder could have been caused by one or several possibilities, including the traumatic brain injury on February 24, 2005, the stroke which occurred on February 24, 2005, and idiopathic causes. On re-direct examination, Dr. Albright stated that to a reasonable degree of medical probability, plaintiff's February 24, 2005, traumatic brain injury was at least a significant contributing cause to the seizure plaintiff experienced on August 24, 2005. Finally, on re-cross examination, Dr. Albright said he would defer to a neurologist on these questions of causation and agreed with Dr. Tegeler's testimony that he could not say to any degree of probability which of the possible causal factors identified was the cause of the August 24, 2005, seizure. The internal medicine specialty, and Dr. Albright's practice, encompass neurological conditions.
25. Plaintiff returned to see Dr. Roy Majors on December 13, 2006, with complaints of shoulder pain. Dr. Majors' impression on January 3, 2007, following imaging studies, was bilateral impingement with full thickness rotator cuff tear in the right shoulder. On January 23, 2007, Dr. Majors performed arthroscopic subacromial decompression, AC resection, and rotator cuff repair for the right shoulder. Plaintiff was placed immediately in aggressive physical therapy. Plaintiff did well, and surgery was scheduled for the left shoulder. Plaintiff was to remain "out of work." The left shoulder surgery was performed March 1, 2007, and was followed by physical therapy. Plaintiff again did well.
26. Dr. Majors stated that the right shoulder condition and surgery for this condition in January 2007 are related to plaintiff's injuries on February 24, 2005. However, Dr. Majors could not "correlate" the left shoulder condition to the February 24, 2005 injury. As of June 22, 2007, plaintiff is at maximum medical improvement with respect to both shoulders and retains a ten percent (10%) permanent partial disability of the right shoulder. Dr. Majors did not place any permanent limitations on plaintiff's physical activity because of the post-surgical right and left shoulder conditions. Dr. *Page 13 
Majors does not anticipate a need for additional medical services in the future for the right shoulder as it relates to the February 24, 2005, injuries.
27. Plaintiff testified that he cannot go from lying flat to standing and has to sit for a few seconds before standing up and walking, otherwise, plaintiff will fall. Plaintiff also watched carefully how he walked and where he stepped when he is walking because otherwise he may fall down. Plaintiff was still sometimes using a cane to help with his balance. Plaintiff did not have these problems before his February 24, 2005, injuries. Plaintiff was experiencing pain in his hands and pain and limitations in his shoulders when he raised his arms. Plaintiff was continuing to experience problems with memory. He was having bad headaches two or three times per week which required him to sit down if standing. Plaintiff only had an occasional headache before his February 24, 2005, injury.
28. Sandra Rawls corroborated plaintiff's testimony concerning his problem with balance. Ms. Rawls explained that plaintiff has difficulty walking straight and has to be careful particularly if he is going room to room. He uses his fingers to kind of hold to the wall to get around. Sandra Rawls had observed this consistently since the February 24, 2005, injury. While there have been some improvements, Ms. Rawls has observed that plaintiff had difficulty in walking and balancing in early July 2005, and at all other times since February 24, 2005. Ms. Rawls observed that plaintiff's memory had gotten a lot better, but he still had memory lapses. Plaintiff did not have this problem before his February 24, 2005, injuries. Ms. Rawls testified, based on her observations of plaintiff, that he would not be able to perform an eight-hour job or part time job or work in any capacity because of his physical and intellectual deficits at the point she testified on December 15, 2005.
29. Dr. Michael Rotberg, an ophthalmologist, addressed whether plaintiff's February 24, 2005, injury caused plaintiff to have glaucoma or caused plaintiff's glaucoma to worsen. Dr. Rotberg is with Carolina Eye Ear Nose Throat Associates in Charlotte, where plaintiff is treated for his *Page 14 
glaucoma. Dr. Rotberg stated that "most likely the accident did not accelerate or otherwise alter the course of" plaintiff's pre-existing glaucoma.
30. Plaintiff was released to drive a standard vehicle when he was seen in Dr. Borresen's office on February 27, 2006. When plaintiff was seen by Dr. Borresen on April 7, 2006, Dr. Borresen noted that plaintiff's seizures were controlled and that the compression fracture was improved. Dr. Borresen noted on August 3, 2006, that plaintiff was continuing to have occasional headaches and dizziness and back pain. Nerve conduction studies on August 7, 2006, were read by Dr. Borresen to show bilateral median nerve compression at the wrist consistent with carpal tunnel syndrome and mild left ulnar compression neuropathy at the elbow.
31. Dr. Borresen indicated that plaintiff's seizure disorder continued to be controlled by medication when he was seen in follow up on November 28, 2006, and April 5, 2007. Plaintiff, however, continued to complain of dizziness and headaches. On October 4, 2007, Dr. Borresen noted that plaintiff was having headaches only when exposed to loud noises and was not then complaining of back pain. Dr. Borresen considered plaintiff to be completely healed from the compression fracture and did not anticipate future treatment for this condition. However, Dr. Borresen stated that plaintiff will require medication for seizures for the remainder of his life. Plaintiff also should be seeing a physician two times per year for routine monitoring and follow up and perhaps more often if he has recurrent seizures. Dr. Borresen commented that plaintiff's seizure disorder remained under control when plaintiff was seen on April 3, 2008, and January 19, 2009.
32. Dr. Borresen addressed in his deposition testimony the relationship between plaintiff's February 24, 2005, injuries and the August 24, 2005, seizure. Dr. Borresen felt the most likely cause of the seizure was the traumatic contusion to the left temporal lobe which occurred when plaintiff was injured on February 24, 2005. Dr. Borresen acknowledged that it is impossible to say with one-hundred *Page 15 
percent certainty what caused the August 24, 2005, seizure. But based on all of the material factors, Dr. Borresen testified that (1) he thought medically it was "more likely that the left temporal contusion was the cause of the seizure" and (2) that "I would think that more likely than not that the temporal contusion was the cause of the seizure." Dr. Borresen was then cross examined and asked if he agreed or disagreed with the opinions earlier expressed by Dr. Charles Tegeler of Wake Forest University Baptist Medical Center. Dr. Borresen stated, "I still have my opinions based on what I've said." While Dr. Borresen appreciated that Dr. Tegeler refused to hold up one of many possible causes as more likely than another, Dr. Borresen's "opinion is that it probably is possible to hold up one as more likely than another." As a basis for his opinion that the left temporal contusion was the cause of the seizure disorder, Dr. Borresen cited the EEG completed immediately after this seizure which was abnormal at the site and the location of the left temporal contusion and "statistically, temporal lobe injuries or contusions or conditions are more likely to be seizures than right parietal conditions. So based on the EEG and statistics, I would think that more likely than not that the temporal contusion was the cause of the seizure."
33. Dr. Borresen addressed plaintiff's physical limitations for work activity at his deposition on August 24, 2006, and later on April 17, 2009. Dr. Borresen stated at the August 2006 deposition that plaintiff had recovered sufficiently from the consequences of his February 24, 2005, injuries and his August 2005 seizure to return to work without restrictions other than not to drive a commercial truck or do very heavy lifting. It is possible that additional limitations, however, would be identified by completion of a standardized test to test balance and formal neuropsychological testing to evaluate plaintiff's memory. On April 17, 2009, Dr. Borresen stated that his opinions on plaintiff's restrictions have not changed since August 2006. The only restrictions Dr. Borresen would impose on plaintiff's activity related to the February 24, 2005, injury still was to restrict plaintiff indefinitely from *Page 16 
commercial driving due to his seizure history and restrictions from performing very heavy lifting due to his history of compression fracture.
34. Defendant arranged for an independent medical examination on February 23, 2006, with Dr. Charles Tegeler at Wake Forest University Baptist Medical Center. Dr. Tegeler is a professor in the Department of Neurology.
35. Dr. Tegeler's opinion was that plaintiff either had a recurrent episode of syncope, or blacking out, which led to the February 24, 2005, accident, or that he experienced at that point a stroke of the right side of the brain, leading to the accident. It also was theoretically possible that the stroke was caused by the head injury, but this is not likely in Dr. Tegeler's view.
36. Dr. Tegeler stated that plaintiff's February 24, 2005, truck accident caused plaintiff to have a traumatic brain injury. This injury resulted in left temporal lobe intracerebral hemorrhage, right temporal parietal lobe contusion, and subarachnoid hemorrhage, and a post-traumatic brain injury concussion syndrome. That the hemorrhaging was related to the traumatic injury is based on the circumstances and appearance of the imaging studies. It looked like what is seen with traumatic brain injury, bruising of the brain, bleeding of the brain or around the brain from trauma.
37. Dr. Tegeler stated that plaintiff did not suffer any type of head or intracranial injury as a result of the August 24, 2005, event. In August 2005, the imaging studies showed persistence of the changes from the stroke. The right parietal stroke was still present and visible in August 2005. However, Dr. Tegeler stated the hemorrhage that was seen in February 2005 was no longer present. This is a typical evolution of hemorrhage or blood in the brain. It dissolves over time.
38. Dr. Tegeler stated that plaintiff had some minimal impairment of memory at his examination and that this related to the February 24, 2005, traumatic brain injury. There often is memory deficit following a concussion. The damage causing this loss of memory is within the brain *Page 17 
but is difficult to localize as to what area of the brain. The brain is the most important organ or part of the body. The memory deficits which persisted in February 2006 were likely related to the organic brain injury in February 2005, and Dr. Tegeler could not predict what this would look like in the future, or whether this would be permanent.
39. On February 23, 2006, Dr. Tegeler found that there was some weakness in the muscles in the left hand causing a weak grip. His opinion was that this was related to an entrapment neuropathy, or injury, to the median nerve and probably not related to the February 24, 2005, accident. Dr. Tegeler also diagnosed a temperature and vibratory sensation impairment in the lower extremities, and temperature sensation impairment in the hands. He attributed this to a peripheral neuropathy, which can result from a number of causes. His opinion is that the bilateral temperature and vibratory sensation loss in the extremities is not related to the February 24, 2005, injury.
40. Dr. Tegeler stated that plaintiff suffered a concussion when he was injured on February 24, 2005. Plaintiff had a concussion syndrome, and a post-concussion headache syndrome. The concussion syndrome has multiple symptoms. Headache can be part of this, and concussions can lead to headaches, or lead to worsening of pre-existing headaches. The course of this headache syndrome is unpredictable, but the symptoms are expected to gradually improve over time. Plaintiff's pre-existing infrequent headaches were worsened following his concussive injuries in February 2005. Dr. Tegeler does not believe that anyone knows whether there is a permanent injury of some kind to the brain which results in these symptoms. Multiple parts of the brain are typically affected by a traumatic brain injury and concussion. There is a small percentage of patients who have persistent deficits, and it cannot be predicted which patients will have these.
41. Plaintiff reported to Dr. Tegeler continued problems with memory or dizziness or unsteadiness with gait or balance. Dr. Tegeler believed the dizziness is probably multifactorial. The *Page 18 
dizziness can persist after a concussion. Dr. Tegeler would place the concussion and post-concussion syndrome at the top of his list of the probable causes of plaintiff's dizziness. Dizziness and balance are often parts of post-concussion syndrome. Dr. Tegeler believes that the dizziness is exacerbated by plaintiff's peripheral neuropathy.
42. Dr. Tegeler believes it is a reasonable assumption that the August 24, 2005, incident was a seizure. There are several different potential causes for the seizure. Dr. Tegeler does not feel capable of saying which of the possible causes was most likely the cause of this seizure. However, because of the slowing of the left temporal lobe on the EEG, Dr. Tegeler would say that the February 24, 2005, injury and hemorrhaging in the left temporal lobe probably would be at the top of his list as the potential cause for this seizure. There may have been more than one factor contributing to the August 24, 2005, seizure and the traumatic brain injury on February 24, 2005, could well have been one of the contributing causes to this seizure.
43. Dr. Tegeler's impression was that the February 24, 2005, accident contributed to a worsening of some underlying neck and shoulder problems. Dr. Tegeler would defer to an ophthalmologist concerning any injury around the orbit of the eye. Plaintiff has been experiencing some impairment of smell since the February 24, 2005, accident. This is something often seen following head injuries because of the damage to the very fine nerves where they pierce the bone above the nasal cavity. Sense of smell, therefore, is often impaired after a head injury and this would tend to be permanent. Dr. Tegeler's opinion to a probability is that the small fine nerves that go from the olfactory nerves in the roof of the nasal cavity were injured and resulted in the loss of the sense of smell.
44. Dr. Tegeler did not express an opinion on whether there was any residual footprint from the hemorrhage in the left temporal lobe. This would require him to look back at the scans *Page 19 
himself to see whether this exists. There can be some leftover footprints from the hemorrhage. Radiological studies are able to detect structural injury to the brain, but there are injuries that can be functional that scans cannot detect. It is possible there are things that a scan will not see that still cause impairment. Injury to the brain was still present when Dr. Tegeler saw plaintiff on February 23, 2006. It would be his hope that the injury related to the traumatic brain injury would improve but there are patients who have persisting deficits the rest of their lives. It was not possible for Dr. Tegeler to predict whether plaintiff's deficits would improve or not. It would be necessary to wait a number of years to make the judgment of whether the impairment to the brain is permanent.
45. Dr. Tegeler believes that, with the exception of the dizziness and some memory deficits, plaintiff had improved to the point that he may have been able to carry out some kind of employment by August 2005. He could not return to work as a commercial truck driver. Dr. Tegeler also believed that it is possible by February 2006 plaintiff was capable of employment in some capacity but this was with the caveat that plaintiff was then experiencing substantial functional impairment because of his shoulder, dizziness, and other things.
46. John McGregor was retained by plaintiff to complete a vocational assessment. Mr. McGregor is a vocational rehabilitation counselor and independent provider of rehabilitation services. Mr. McGregor completed his assessment in November 2006 and concluded that plaintiff was not a candidate for vocational rehabilitation services. Based on plaintiff's history of high earnings and his medical situation, Mr. McGregor thought it would be unreasonable for him to try to return plaintiff to any kind of work. Mr. McGregor could not "identify any cost-effective return to work option" and believed that retirement was the best option for plaintiff, given his age, educational status, and the difficulty in identifying any suitable employment for plaintiff. *Page 20 
47. Mr. McGregor was asked his opinion, based on several alternative assumptions, on whether there was a reasonable likelihood that plaintiff would have been hired in the competitive labor market if he diligently sought a job in the Charlotte market in the period since July 2005. Mr. McGregor stated that plaintiff would have been unable to locate work in the competitive labor market beginning in July 2005 if plaintiff was unable to drive commercially and if plaintiff was limited to work at the sedentary or light exertional levels. Light work entails lifting twenty pounds maximum and frequent lifting up to ten pounds. Plaintiff's previous work experience was classified as medium or heavy work.
48. Mr. McGregor testified that it may have been possible to locate employment for plaintiff during the period since July 2005 if plaintiff's only limitations were the inability to drive commercially and to perform physical work exceeding work at the medium exertional level. Mr. McGregor's opinion was that plaintiff could have earned about ten dollars per hour if he could have located work at the medium level of exertional activity. Mr. McGregor suggested that there were significant non-exertional limitations which would impact on plaintiff's capacity to work in the competitive labor market. He recommended that neuropsychological testing be arranged to identify the specific memory and balance deficits if employment was to be sought for plaintiff
49. On February 24, 2005, plaintiff had an episode of syncope, or a stroke, which caused him to lose control of the truck he was driving. Plaintiff's February 24, 2005, truck accident resulted in a left temporal lobe intracerebral hemorrhage, right temporal parietal lobe contusion, and subarachnoid hemorrhage, and a post-traumatic brain injury concussion syndrome. The truck accident also caused a laceration to the right forehead, injury to the orbit around the right eye, laceration of the left lower leg, and contusion and aggravation of degenerative disease in plaintiff's right shoulder AC joint. *Page 21 
50. The injuries sustained by plaintiff on February 24, 2005, arose out of and in the course of his employment by defendant. Plaintiff was acting in the course of his employment and the injury followed because of either an episode of syncope, or stroke, and the position of plaintiff operating the tractor trailer truck when this occurred.
51. The problems plaintiff has experienced since February 24, 2005, with memory, concentration, imbalance, dizziness and worsening of pre-existing headaches was caused by plaintiff's February 24, 2005 traumatic brain injury.
52. The seizure plaintiff experienced on August 24, 2005, was caused by the traumatic brain injury plaintiff sustained on February 24, 2005. Plaintiff's compression fracture at T12-L1 is a complication of plaintiff's seizure on August 24, 2005, which occurred when the muscles contracted and caused the vertebrae collapse.
53. Since February 24, 2005, plaintiff has had medical treatment for several medical conditions which are unrelated to his traumatic brain injury on that date. These unrelated conditions include: plaintiff's glaucoma, entrapment neuropathies in the wrist and elbow, and any peripheral neuropathy or temperature and vibratory sensation loss in the extremities.
54. As a result of plaintiff's February 24, 2005, injury by accident, plaintiff has sustained permanent injury or damage to several organs or parts of the body. This includes permanent damage to the brain, the most important part of the body, a ten percent (10%) impairment of the right shoulder, serious scarring on the right forehead and left lower leg, damage to the olfactory nerves impacting on the sense of smell, and a seizure disorder for which plaintiff will require medical monitoring and medication for the balance of his life.
55. As a result of the injuries plaintiff sustained from his February 24, 2005, injury by accident, plaintiff has been unable to work from February 24, 2005, up to and including June 22, 2007. *Page 22 
Plaintiff has been unable to earn any wages in his former position with defendant or in any other employment from February 24, 2005, through June 22, 2007. The evidence of record is insufficient to determine whether plaintiff was able to work after June 22, 2007.
56. The studies, procedures, and treatment following February 24, 2005, for the injuries to plaintiff's brain and other injuries sustained by plaintiff on February 24, 2005, and plaintiff's seizure disorder beginning August 24, 2005, including treatment at the Presbyterian Hospital, and by Dr. Harold Albright, by Dr. Erik Borresen, and by Dr. Roy Majors, and the studies and procedures by these physicians for evaluation and treatment of the effects of plaintiff's compensable traumatic brain injury and plaintiff's seizure disorder beginning August 24, 2005, were reasonably required to evaluate and provide relief from the effects of plaintiff's injury by accident.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On February 24, 2005, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant. N.C. Gen. Stat. § 97-2(6); Allred v. Allred-Gardner,Inc., 253 N.C. 554, 117 S.E.2d 476 (1960).
2. Plaintiff's August 24, 2005, seizure is the direct and natural result of and causally related to plaintiff's February 24, 2005, injury by accident.
3. To prove disability under the act, an injured employee must establish that he is incapable of earning the same wages he earned at the time of contracting the disease or receiving the injury, at his same job or any other employment. Hilliard v. ApexCabinet Co., 54 N.C. App. 173, 282 S.E.2d 828 (1981), rev'd onother grounds, 305 NC 593, 290 S.E.2d 682 (1982). An *Page 23 
employee may prove he is incapable after injury of earning the same wages he earned before injury in any other employment in one of four ways: (1) the production of medical evidence that he is physically or mentally, as a consequence of the work related injury, incapable of work in any employment; (2) the production of evidence that he is capable of some work, but has, after a reasonable effort been unsuccessful in his effort to obtain employment; (3) the production of evidence that he is capable of some work but that it would be futile because of pre-existing conditions, i.e., age, inexperience, or lack of education, to seek other employment; (4) the production of evidence that he has obtained other employment at a wage less than that earned prior to the injury. Russell v. Lowe's ProductionDistribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993). Plaintiff has met his burden for the period of February 25, 2005, through June 22, 2007. Plaintiff is entitled to compensation at the rate of $704.00 per week for temporary total disability as a result of his February 24, 2005, injury by accident from February 25, 2005 through June 22, 2007. N.C. Gen. Stat. § 97-29.
4. Plaintiff is entitled to have defendants provide all medical compensation arising from this injury by accident, including medical expenses for plaintiff's seizure disorder. N.C. Gen. Stat. §§ 97-2(19); 97-25.
5. In that the record contains insufficient evidence concerning plaintiff's inability to earn wages from June 22, 2007, through the present, the Full Commission requires additional evidence before rendering a decision on the issue of temporary total disability from June 22, 2007, and continuing.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law the Full Commission makes the following: *Page 24 
 AWARD
1. Defendant shall pay compensation to plaintiff at the rate of $704.00 per week from February 24, 2005, through June 22, 2007. The compensation which has accrued shall be paid in a lump sum to plaintiff subject to the attorney's fee hereinafter approved.
2. Defendant shall pay for all medical expenses incurred or to be incurred by plaintiff as a result of his February 24, 2005, injury by accident when bills for same have been submitted to and approved by the North Carolina Industrial Commission, for so long as such evaluations, treatments, and examinations may reasonably be required to effect a cure, give relief and/or lessen plaintiff's period of disability.
3. Plaintiff's claim for temporary total disability compensation for the time period of June 22, 2007, through the present, is RESERVED. The Full Commission reopens the record for additional evidence concerning plaintiff's ability to earn wages. The parties are to take the depositions of Dr. P. Jeffrey Ewert and Dr. Charles Tegeler. All supplemental evidence shall be completed within 45 days from the date of this Opinion and Award. Additional evidence, stipulations, supplemental briefs, and motions shall be submitted to Commissioner McDonald. The Full Commission retains jurisdiction of this case, and upon receipt of the additional evidence, the Commission will render its decision on this issue.
4. A reasonable attorney's fee of twenty-five percent (25%) of the compensation awarded to plaintiff in paragraph one (1) is hereby approved to be deducted from the lump sums accrued and paid directly to plaintiff's attorney.
5. Defendant shall pay the costs.
This the 23rd day of September, 2010. *Page 25 
 S/___________________ DANNY LEE McDONALD COMMISSIONER
CONCURRING:
 S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/___________________ LINDA CHEATHAM COMMISSIONER *Page 1